MOTOR CARRIERS LABOR ADVISORY COUNCIL, et al.

v.

TRUCKING MANAGEMENT, INC., et al.

Civ. A. No. 86–4562.

United States District Court, E.D. Pennsylvania.

April 5, 1989.

Robert J. Bray, Jr., Philadelphia, Pa., for plaintiffs.

Francis M. Milone and Steven R. Wall, Morgan, Lewis & Bockius, Philadelphia, Pa.; Robert A. Dufek and Francis L. Casey, III, Washington, D.C., for Trucking Mgt., Inc.

James A. Matthews, Jr. and Michael J. Ossip, Morgan, Lewis & Bockius, Philadelphia, Pa., for Central Pa. Motor Carriers Conf., Inc.

J. Kittredge Fegley, Jack G. Mancuso and Michael L. Mixell, Reading, Pa., for Central Pa. Teamsters Pension Fund, Central Pa. Teamsters Health and Welfare Fund, James Burns, Wm. Baum, John Kleinfelter and Vincent Dagen.

## OPINION AND ORDER

HUYETT, District Judge.

Plaintiffs' 53 page, 14 count complaint requires a careful balance of the policies of two fundamental and often competing areas of law governing the conduct of business and employee relations. The case involves charges of union domination of the management of employee benefit trust funds, and, at the same time, manipulation and control of the union by a large nation-wide multi-employer bargaining association. Plaintiffs claim that the alleged union domination of the benefit funds is the result of a structural defect caused by the employer trustee appointment process and

violates section 302(c)(5) of the Labor Management Relations Act [hereinafter, LMRA], 29 U.S.C. § 186(c)(5)(B) (1982 & West Supp.1988), and various provisions of the Employee Retirement Security Act of 1974 [hereinafter, ERISA], 29 U.S.C. §§ 1001–461 (1982 & West Supp.1988). The alleged manipulation and control of the union by the multi-employer bargaining association, according to plaintiffs, violates sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2.

In four separate motions, defendants seek summary judgment in their favor on essentially two areas of the plaintiffs' second amended complaint, the antitrust counts and the union domination counts. After extensive discovery, briefing, and oral argument, I conclude that plaintiffs' theory of antitrust violations must fail on a number of different grounds. I will, therefore, grant defendants' motions for summary judgment on counts XI and XII. As to plaintiffs' theories of structural defects and union domination in the trust agreements governing the Central Pennsylvania Teamsters Pension Fund and the Central Pennsylvania Teamsters Health and Welfare Fund, I conclude that the remedy of a reformation of the trust agreements as plaintiffs seek is not available on the facts of this case. Therefore, I will grant defendants' motions for summary judgment as to counts II, III, IV, V, VI, VII and X of the second amended complaint.[1]

### I.

#### A. The Parties

As with many antitrust cases, "[s]tating the facts of this case is a daunting task." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 576, 106 S.Ct. 1348, 1351, 89 L.Ed.2d 538 (1986). This suit is complex because plaintiffs raise issues under ERISA and

---

1. Judgment on counts VII and X shall be entered only to the extent those counts purport to state claims under section 301 of LMRA. Defendant Trustees and Funds also seek summary judgment on count VIII to the extent it seeks equitable modification of the trust agreements. To my reading, count VIII seeks such modifica-

tion under ERISA. Because the parties have not addressed the extent, if any, such relief is available under ERISA in briefing the instant motions, I shall deny defendants' motion to the extent it requests judgment on count VIII on grounds other than LMRA.

LMRA in respect to their claims against defendants.

Plaintiffs consist of three groups: employer representation associations, individual employers, and individual employees. Defendants are two employer representation associations, two Taft–Hartley employee benefit trust funds and the trustees of the funds. The common link among all the parties is their involvement with the International Brotherhood of Teamsters ("IBT"), a nationwide union, and various locals of the IBT representing members in the Central Pennsylvania region. Neither the IBT nor any of its locals are parties to this action.

The employer representation associations are Motor Carriers Labor Advisory Council ("MCLAC") and Eastern Labor Advisory Association ("ELAA", collectively, "Association plaintiffs"). These entities are associations of small to medium sized trucking firms which provide their members with collective bargaining and grievance services.

The Employer plaintiffs are Chemical Leaman Tank Lines, Inc. ("Chemical"), Materials Transport Service, Inc. ("MTS"), Acme Markets, Inc. ("Acme"), and Schwerman Trucking Company ("Schwerman"). Chemical and MTS employ members of the IBT under collective bargaining agreements with IBT Local 773. Acme employs IBT members under a collective bargaining agreement with IBT Local 401. The record is unclear as to which local represents Schwerman employees. Under collective bargaining agreements, each of these employers contributes to the defendant employee benefit funds. With the exception of Acme, the employer plaintiffs are all members of ELAA, and utilize its services for collective bargaining with the IBT. Acme has a separate bargaining agreement with the IBT.

The individual employee plaintiffs are Gustav Braun, Leonard Parsons, and Fred Ahlberg (collectively, "employee plaintiffs"). Braun is a managerial employee of Chemical who has vested and accrued rights to benefits under the defendant employee benefit funds. Parsons and Ahlberg are employees of Chemical who also have vested rights to benefits under the defendant benefit funds.

The employer representation association defendants are Trucking Management, Inc. ("TMI"), and the Central Pennsylvania Motor Carriers Conference, Inc. ("Conference").[2] Since the early 1960s, TMI, a multi-employer bargaining association, negotiated with the IBT on a national level for the majority of employers in the dry freight industry who employ IBT members. Among the trucking companies TMI represents are three so-called nationwide network carriers, Yellow Freight Systems, Inc., Roadway Express, Inc., and Consolidated Freightways, Inc. (collectively, "Nationwide Network Carriers"). Again, as with the IBT and Local 429, plaintiffs chose not to pursue this litigation against these companies directly.[3]

The Conference is the bargaining agent for TMI members in the Central Pennsylvania region. The two funds, the Central Pennsylvania Teamsters Pension Fund, and the Central Pennsylvania Teamsters Health and Welfare Funds (collectively, "Funds"), are employee benefit trust funds under LMRA, section 302(c)(5)(B), 29 U.S.C. § 186(c)(5)(B). Under the relevant trust agreements, each Fund is governed by four trustees. In each case, two of the trustees are appointed by employers, and two by the union. The individuals who serve as employer trustees are defendants William Baum and Vincent R. Dagen. James L. Burns and John P. Kleinfelter are the two union trustees. These individuals are the trustees for both Funds.

In spite of all the legal complexities of this case, there is one dispute lying at the

**2.** The pleadings refer to "Central Pennsylvania TMI Association" as the entity which selects the employer trustees. This entity is the Conference for purposes of this litigation.

**3.** In April, 1988, plaintiffs moved to file a third amended complaint which named the Nationwide Network Carriers. For the reasons stated in my order of November 1, 1988, plaintiffs were denied leave to file a third amended complaint.

center of this litigation. Under the various agreements, the employer trustees are appointed by the Conference. The Employer and Association plaintiffs desire to change the agreements which give the Conference the exclusive authority to appoint the employer trustees. Plaintiffs claim that the Conference is controlled by the Nationwide Network Carriers through their control of TMI.

### B. Background

To understand the facts of this case, a background in the structure and procedure of the collective bargaining methods employed by the IBT is necessary. Because the IBT is a nationwide union with thousands of members who are employed by thousands of employers in different industries, the IBT negotiates a master agreement with the employers in each industry group. The national agreement for the dry freight industry is called the National Master Freight Agreement ("NMFA"). The NMFA consists of a master contract, negotiated by TMI, plus twenty-eight area supplements. The area supplements are negotiated on a regional level with the multi-employer bargaining associations, employers and locals within each geographic region. The first NMFA was negotiated in 1964. The current NMFA covers in excess of 200,000 employees who work for over 1,200 employers throughout the United States.

Prior to 1985, TMI and MCLAC jointly negotiated the NMFA on a national level. The terms and provisions of the NMFA were administered by both employer associations under a single network of grievance committees controlled by TMI. When the most recent NMFA was being negotiated in 1985, MCLAC decided to engage in separate NMFA negotiations from TMI. Thus, currently there exist at least two separate trucking industry NMFAs; one governing the relationship of employers and employees of TMI associated employers ("TMI NMFA"), and another governing the relationship of MCLAC employers and employees ("MCLAC NMFA"). Independent employers may become signatories to the NMFAs without affiliating with either employer association. They must, however,

choose a grievance committee operated by one or the other. The NMFAs currently in force were negotiated in 1985 and expired in 1988.

Contributions to employee benefit funds are negotiated on both the national and regional levels. At the national level, the NMFA sets the combined contribution levels to both the health and welfare and the pension funds. The area supplements allocate the total contributions, as defined by the NMFA, between the two Funds. Further, other separate supplemental agreements cover a wide variety of topics within the employer-employee relationship between multi-employer bargaining associations or individual employers and IBT locals.

The individual employers, except plaintiff Acme, employ members of IBT Local 773. The collective bargaining agreements governing their relationship is negotiated by ELAA. The agreements are called the Eastern Area Cement Haul Agreement ("EACHA") and the Eastern Area Tank Haul Agreement ("EATHA"). Acme has a separate collective bargaining agreement with IBT Local 701. Importantly, plaintiffs are neither governed by the TMI NMFA, nor are they represented in any way by TMI or the Conference. MCLAC represents other employers who are not represented by TMI or the Conference.

### C. Procedural History

The original complaint was filed on July 31, 1986. That complaint was accompanied by a motion for a temporary restraining order seeking, *inter alia*, preliminary injunctive relief requiring that certain plaintiffs not be compelled to execute certain documents related to the Funds. After the parties reached agreement on the execution of the documents, the motion was withdrawn on August 12, 1986.

On August 13, 1986, plaintiffs filed an amended complaint containing fourteen counts. Plaintiffs sought various forms of declaratory, equitable, and monetary relief. On May 28, 1987, after limited discovery, I partially granted motions for judgment on the pleadings brought by the defendants. In the order granting partial judgment on

the pleadings, I granted plaintiffs leave to amend their complaint to state claims for the individual employee plaintiffs for breach of fiduciary duty under ERISA and the federal common law of ERISA. Plaintiffs did so, and filed a second amended complaint on June 12, 1987. Thereafter, the parties commenced full discovery proceedings.

During discovery, it became evident that plaintiffs' counsel was attempting to broaden the claims in counts XI and XII of the second amended complaint. Count XI purportedly states a claim for relief under section 1 of the Sherman Act, for conspiracy "to fix, control, raise, and stabilize the fringe benefit costs of [trucking] carriers doing business in ... the trucking industry [.]" Second Amended Complaint at 46. Count XII states a claim for relief under section 2 of the Sherman Act for monopoly or attempted monopoly in "the trucking marketplace in the Pennsylvania region [.]" Second Amended Complaint at 47. Following a pretrial conference in September, 1987, an issue arose concerning the geographic scope of plaintiffs' antitrust allegations.

Subsequently, on January 7, 1987, defendants filed a motion for an order limiting discovery on the antitrust claims to the Pennsylvania region. After considering defendants' motion, plaintiffs' response that the complaint alleged a nationwide antitrust conspiracy, and the allegations of

the second amended complaint, on January 27, 1988, I limited discovery to the Pennsylvania region. Plaintiffs then filed a motion to file a third amended complaint which alleged a nationwide predatory pricing conspiracy by the defendants and the Nationwide Network Carriers. The proposed third amended complaint named the Nationwide Network Carriers as defendants. By Order dated November 1, 1988, I denied plaintiffs leave to file a third amended complaint.

Defendants move for partial summary judgment on plaintiffs' claims of antitrust violations under sections 1 and 2 of the Sherman Antitrust Act, counts XI and XII, and the claims of violations of section 302(c)(5) of LMRA contained in counts II through VII. The Funds and their Trustees also seek summary judgment on count VIII which alleges a breach of fiduciary duty under ERISA and the federal common law of ERISA, and count X which requests equitable modification of the terms of the Funds' trust agreements.

## II.

### The Antitrust Claims

The antitrust claims are brought by the Association and Employer plaintiffs, except Acme, against all defendants. While more specific facts are discussed below, plaintiffs' antitrust theory [4] is essentially that TMI and the other defendants conspired to "dupe" the IBT into agreeing to higher

---

**4.** The section 1 conspiracy count of plaintiffs' second amended complaint alleges that by virtue of the exclusive authority of defendant Conference to appoint the employer trustees to the Funds under the governing trust agreements, TMI, Conference, the Trustees and Funds have conspired to fix, control, raise, and stabilize the fringe benefit costs of carriers doing business in interstate commerce; to restrain trade in interstate commerce for the trucking industry; and to preclude plaintiffs, their members and the independent carriers similarly situated from operating ... except on terms controlled by defendants TMI, [Conference] and the ... Trustees....

Defendants TMI and [Conference] have continually encouraged, induced, coerced and conspired with defendant [Employer] Trustees to seek to deprive plaintiffs and/or other similarly situated independent employers of representation on the Funds.

Second Amended Complaint at 46, ¶ 135–36.

Plaintiffs' section 2 claim alleges

Defendants TMI, [Conference], and [Employer] Trustees continued enforcement of the Trust Agreements' provision that the [Conference] exclusively designate the Employer Trustees to control and manage the Funds has been undertaken to monopolize and/or attempt to monopolize the trucking marketplace in the Pennsylvania region....

As a result of defendants' monopoly, attempted monopoly and/or conspiracy to monopolize the marketplace, plaintiffs, their members and independent employers similarly situated, were compelled to make unreasonably high contributions to the Funds and were unable to conduct their businesses, except on the arbitrary, unlawful, and unreasonable terms dictated by the defendants.

Second Amended Complaint, at 48, ¶ 140–141.

fringe benefit rates under the TMI NMFA negotiated in 1985. The result of the alleged conspiracy was to cause employers represented by MCLAC and ELAA to pay increased fringe benefit rates into the Funds under *other collective bargaining agreements negotiated by other employers with the IBT* in 1985. According to plaintiffs, the motivation for increasing the fringe benefit costs was to inflict higher costs on the small to mid-sized trucking companies plaintiffs purport to represent. Thus, the marginal trucking company operators would be forced from the "trucking marketplace" by reason of the higher fringe benefit costs. The eventual objective of the alleged conspiracy, once the other operators were forced from the market, is to obtain a monopoly of the trucking industry in the region.

Further, plaintiffs argue defendants conspired to impose certain rules on employers who contribute to the Funds. The rules are allegedly designed to keep the employers contributing to the Funds. The contribution rates are allegedly "artificially inflated" as a result of the conspiracy among the TMI employers.

A. Exemptions from Antitrust Liability

The parties raise various contentions about the scope of the nonstatutory exemption from the antitrust laws for the activities of organized labor and its applicability to this case. Plaintiffs argue that the nonstatutory exemption is inapplicable under *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and *Allen Bradley Co. v. International Brotherhood of Electrical Workers*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). Defendants argue that plaintiffs have failed to meet their burden in producing sufficient evidence that the alleged combination of the IBT and defendants reached beyond the scope of the collective bargaining agreement between TMI and the IBT.

The nonstatutory labor exemption is based on an accommodation of the often competing policies in favor of collective bargaining and in favor of free competition in the economic marketplace. *Connell*

*Construction Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). The Supreme Court described the sources of organized labor's nonstatutory exemption from the antitrust laws as

the strong policy favoring association of employees to eliminate competition over wages and working conditions. Union success in organizing workers and standardizing wages will ultimately affect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of antitrust laws.

*Id.* at 621–22, 95 S.Ct. at 1835.

The nonstatutory labor exemption is not applicable to combinations of a union and employers who combine to impose anticompetitive restraints on parties who are not party to their collective bargaining agreement. *Pennington*, 381 U.S. at 662, 85 S.Ct. at 1589. The Third Circuit has interpreted *Connell* to hold

that an agreement between a union and a business organization, outside a collective bargaining relationship, which imposes a direct restraint upon a business market, and which is not justified by congressional labor policy because it has actual or potential anticompetitive effects that flow naturally from the elimination of competition over wages and working conditions, is not exempt from antitrust scrutiny.

*Larry v. Muko, Inc. v. Southwestern Pennsylvania Building and Construction Trades Council*, 609 F.2d 1368, 1373 (1979), *cert. denied*, 459 U.S. 916, 103 S.Ct. 229, 74 L.Ed.2d 182 (1982).

In the case *sub judice*, plaintiffs do not contend that the *IBT* and defendants knowingly conspired together to impose higher fringe benefit costs upon plaintiffs and the employers they claim to represent. If this were plaintiffs' conspiracy allegation, then defendants may be correct in arguing that the nonstatutory labor exemption applies to the negotiation of fringe benefit contribution rates under the TMI NMFA. The goal of obtaining higher and

uniform fringe benefit rates from all employers would be lawful even if the higher contribution rates would ultimately force some employers from the market. *See Connell*, 421 U.S. at 625, 95 S.Ct. at 1836.

However, plaintiffs' contention is quite the opposite—plaintiffs claim defendants conspired among themselves to manipulate the IBT into demanding higher rates from other employers who were not parties to the TMI NMFA. While evidence of this alleged conspiracy contained in the record is, as discussed below, admittedly lacking, if plaintiffs could prove the existence of the conspiracy and that its objective was to inflict higher fringe benefit costs on other employers, the nonstatutory exemption would be inapplicable. *Altemose Construction Co. v. Building & Construction Trades Council*, 751 F.2d 653, 659–60 (3rd Cir.1985) (nonstatutory labor exemption is inapplicable when the identified objective of the alleged conspiracy is unlawful), *cert. denied*, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986); *Carpenter's Local Union No. 1846 v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 530–531 (5th Cir.1982) (alleged conspiracy among employers and multi-employer bargaining association without agreement of union is not covered by nonstatutory labor exemption), *cert. denied*, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed. 2d 305 (1983); *Consolidated Express, Inc. v. New York Shipping Ass'n*, 602 F.2d 494, 514 (3rd Cir.1979) ("[R]estraints ... which are aimed at controlling a secondary product market or service are suspect, and are presumptively covered by the Sherman Act."), *vacated and remanded on other grounds*, 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980).

Further, the union has not been named as a party to this suit. None of the plaintiffs or defendants in this action have pursued the union or any local for any possible wrongdoing. I am unable to locate any authority for the proposition that the nonstatutory labor exemption should be applied to a conspiracy of employers, and their actual or alleged agents. I, therefore, conclude that the nonstatutory labor exemption is inapplicable to plaintiffs' antitrust claims against TMI and Conference.

■ The conclusion that the nonstatutory labor exemption is inapplicable to these claims does not, however, mandate the conclusion that no exemption exists for all defendants to this action. Plaintiffs are seeking both monetary and injunctive relief from defendant Funds for the alleged antitrust violations. Plaintiffs cite no precedent for the proposition that a qualified employee benefit trust fund may be held liable for antitrust damages or that a court may impose some type of injunctive relief on a qualified employee benefit fund under the antitrust laws.[5] In fact, plaintiffs admit "it would seem to require more that [sic] just a lack of grace to advocate a position that fiduciary entrusted funds, earmarked for the benefit of participants and their families, should pay for '[Association and Trustee Defendants'] antitrust violations.'" Plaintiffs' Memorandum in Reply to TMI and Conference Motion for Partial Summary Judgment on Antitrust Claims, at 13.

■ Defendant Funds and Trustees assert that plaintiffs' claims against the Funds should be barred by analogy to LMRA section 301(b).[6] In *Lewis v. Bene-*

---

**5.** Plaintiffs' Consolidated Reply Memo, at 140, states "[I]t must be noted that the allegations set forth by Plaintiffs do not set forth a factual scenario under which a large body of antitrust caselaw has developed. In fact, there may be no cases which are directly on point factually." Plaintiffs argue that because defendants are unable to find caselaw supporting the proposition that a contributing employer *cannot* sue a benefit fund for antitrust violations, they should be allowed to proceed with their claims against the Funds. Plaintiffs' Consolidated Reply at 170. While this statement seems to be an admission that plaintiffs' antitrust claims against the

Funds are skating dangerously close to a violation of Fed.R.Civ.P. 11, I believe plaintiffs are attempting to make "a good faith argument for the extension, [or] modification ... of existing law[.]"

**6.** Section 301(b) provides in part:
Any money judgment against a labor organization in a district court ... shall be enforceable only against the organization as an entity and against its assets, and shall not be the sole source of recovery for injury inflicted by it.
29 U.S.C. § 185(b).

*dict Coal Corp.*, 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960), the Supreme Court discussed the implications of section 301(b).

> [Section 301(b) ] evidences a congressional intention that the union as an entity, like a corporation, should in the absence of agreement be the sole source of recovery for injury inflicted by it. Although this policy was prompted by solicitude for the union members, because they might have little opportunity to prevent the union from committing actionable wrongs, it seems to us to apply with even greater force to protecting the interests of beneficiaries of the welfare fund, many of whom may be retired, or may be dependents, and therefore without any direct voice in the conduct of union affairs. Thus, the national labor policy becomes an important consideration in determining whether the same inferences which might be drawn as to other third-party agreements should be drawn here.

*Id.* at 470, 80 S.Ct. at 496 (footnotes omitted).

Defendants argue that the caselaw following *Benedict Coal* holds section 301(b) to preclude suits by employers against benefit funds. Plaintiffs respond that section 301(b) is not read by courts to preclude suits by employers to obtain contributions wrongfully made to a fund. *See, e.g., Whiteworth Brothers Storage Co. v. Central States*, 794 F.2d 221, 236 (6th Cir.), *cert. denied*, 479 U.S. 1007, 107 S.Ct. 645, 93 L.Ed.2d 701 (1986). Thus, plaintiffs contend "much of the Funds' assets are derived from the conspiratorial acts of Defendants and Plaintiffs are therefore entitled to such monies." Plaintiffs' Consolidated Reply, at 172.

Plaintiffs' argument is unpersuasive. There is no evidence in the record as to how much of the Funds' assets were derived from the alleged conspiracy. The Funds have existed since the mid–1950s and cover many employees who have nothing to do with either plaintiffs or defendants in this case. Plaintiffs' antitrust theories allege a conspiracy beginning sometime in the early 1980s. To allow plaintiffs to recover from the Funds would require recomputing the benefits for all the members covered by the Funds. Not only would determining this create an administrative nightmare, but it may jeopardize the benefits of workers who retired long before the alleged conspiracy was initiated. These are precisely the same concerns which the Supreme Court voiced in *Benedict Coal*. There simply is no legal basis for allowing plaintiffs to claim that qualified benefit trust funds can be held liable for antitrust violations of contributing employers and employer trustees. Accordingly, I hold the Funds are exempt from antitrust liability by analogy to section 301(b) and will enter judgment in favor of the Funds on counts XI and XII.[7]

### B. Antitrust Standing

TMI and the Conference assert that the Association and Employer plaintiffs lack standing to assert antitrust claims against them. Because of the variety of plaintiffs, I shall review the arguments as to each group separately.

#### 1. *Association Plaintiffs*

Defendants contend that because ELAA and MCLAC[8] are associations of employers

---

**7.** Plaintiffs also seek injunctive relief against the Funds to bar the Funds from enforcing certain provisions regarding the appointment of trustees. It is difficult to understand how these provisions can be employed to inflict anticompetitive injury. *See* Part II B 3 b, *infra.* Because I find that the Funds are exempt from antitrust liability in this case, I do not reach the issue of whether they could be enjoined from continued violations of the antitrust laws.

**8.** There is a dispute as to exactly who the MCLAC is that is a party to this suit. Plaintiffs contend that the MCLAC involved in this suit is a nationwide collective bargaining association, representing independent employers throughout the country. Defendants claim that the MCLAC here is really "MCLAC East," a grievance operation run from counsel for the plaintiffs' offices. They argue that of the four employers who belong to MCLAC in the geographic area covered by the Central Pennsylvania Funds, three have expressly disavowed any knowledge of or participation in the antitrust conspiracy claim of this suit. Determining who MCLAC represents in this suit requires a factual determination of MCLAC's authorization from its membership to pursue this litigation on the memberships' behalf.

who are neither consumers nor competitors of TMI and Conference member carriers, they lack standing to pursue injunctive relief for the alleged antitrust violations as an association. In *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Supreme Court summarized the prerequisites for standing to sue as an association.

> [W]e have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* at 343, 97 S.Ct. at 2441.

■ In this case, both Association plaintiffs are organizations who represent their members for purposes of collective bargaining and grievance procedures. They allege that the defendants illegally combined to inflate fringe benefit costs of their members. It is beyond dispute that fringe benefit costs are germane to both Associations' purpose, that of negotiating collective bargaining agreements. Thus, I conclude that the interest MCLAC and ELAA seek to protect, their ability to negotiate fringe benefit contribution rates without the allegedly illegal conspiracy of the defendants, is germane to their purpose as organizations.

Regarding MCLAC's standing as an association, at oral argument on these motions, I asked counsel for plaintiffs about the relief MCLAC was seeking.

> [by the Court] Q: What specific relief are you seeking on behalf of MCLAC in the antitrust part of this lawsuit?
>
> [by Mr. Bray] A: We're asking for injunctive relief as part of the request to remove the current trustees, the employer-designated trustees, on the Central

At the summary judgment stage, the facts must be viewed in the light most favorable to the opposing party, and reasonable doubt as to the existence of a genuine issue of material fact must be resolved against the moving party.

Pennsylvania Funds and monetary damages against the trustees and Fund [sic] for damages suffered on behalf of all plaintiffs, including MCLAC.

> Q: Do not the individual employers that you represent have to be party to this suit in order to obtain this type of relief?
>
> A: Yes, they do. Yes, they do.
>
> . . . .
>
> But that only means that those employers would not be eligible to collect damages, but the injunctive relief portion is still available.

Transcript of Oral Argument, September 23, 1988, at 26–27.

First, I do not understand counsel's last statement. I already ruled that MCLAC cannot maintain this action for damages. *See* Order of May 28, 1987, at 9. The relief MCLAC seeks is a reformation of the collective bargaining agreements and area supplements between IBT locals and individual employers to permit MCLAC's participation in the management of the Funds. Such relief makes "the individual participation of each injured party indispensable to the proper resolution of the case...." *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2212, 45 L.Ed.2d 343 (1975).

■ Further, it is not at all clear from the record that the employers MCLAC claims to represent have authorized it to pursue this lawsuit, or enter into collective bargaining agreements on their behalf. *See supra* n. 8; Addendum to Memorandum of Law of Defendants TMI and Conference, Exhibit C (affidavits of three MCLAC members' representatives disclaiming authorization of MCLAC to maintain this lawsuit on their behalf and stating that MCLAC does not have "a power of attorney or similar authorization ... to negotiate any collective bargaining agreements on [their] behalf."). Thus, even if MCLAC were successful in this suit, it does not have the authorization of at least some

*Continental Insurance Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.1982). For purposes of determining association standing, therefore, I assume MCLAC is a nationwide employer bargaining association.

of its members to adopt an agreement containing the relief it seeks on behalf of its membership. Given the inability of MCLAC to obtain the injunctive relief it seeks without the participation of the employers it represents, MCLAC lacks standing to pursue that relief.

■ ELAA, on the other hand, presents the converse of MCLAC's position. ELAA is a small employer collective bargaining association representing four employers in total. In fact, three of the four employers who are members of ELAA are plaintiffs to this action. The injury ELAA claims to have sustained as a result of the alleged conspiracy is a denial of its ability to freely negotiate fringe benefit rates with IBT locals on behalf of its members. ELAA does not claim to have suffered any injury to itself. "[I]n the absence of injury to itself, an association may have standing *solely* as the representative of its members." *Warth*, 422 U.S. at 511, 95 S.Ct. at 2211 (emphasis added). The three individual employer plaintiffs are the only ELAA members who desire to participate in this litigation. Plaintiffs do not suggest that ELAA may obtain some relief on its behalf which the Employer plaintiffs cannot obtain on their own. ELAA is therefore not a proper party to this action. I conclude that ELAA lacks standing to pursue the antitrust allegations of the second amended complaint and is merely asserting an "abstract concern for the well-being of [its members] as the basis for its standing." *Hunt*, 432 U.S. at 342, 97 S.Ct. at 2441.

### 2. *Employer Plaintiffs*

Defendants TMI and Conference vigorously urge that the employer plaintiffs to the antitrust claims (the Employer Plaintiffs, except Acme) lack standing to pursue the claims based on the factors enunciated in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) [hereinafter, *Associated General* ]. In *Associated General*, the Court discussed the issues involved in standing to bring an antitrust suit under section 4 of the Clayton Act, 15 U.S.C.

§ 15. "[T]he question [of standing] requires ... an evaluat[ion of] the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Id.* at 535, 103 S.Ct. at 907. The relevant factors in considering whether a plaintiff has standing under section 4 are:

1. Whether the plaintiff falls within the group of "private attorneys general" created to enforce the antitrust laws under section 4;

2. The causal connection between an antitrust violation and the injured party;

3. the nature of the plaintiff's alleged injury; and

4. the directness or indirectness of the asserted injury.

*Associated General*, 459 U.S. at 538–42, 103 S.Ct. at 908–11; *Gregory Marketing Corp. v. Wakefern Food Corp.*, 787 F.2d 92, 94–95 (3rd Cir.), *cert. denied*, 479 U.S. 821, 107 S.Ct. 87, 93 L.Ed.2d 40 (1986); *Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 963–64 (3rd Cir.1983), *cert. denied*, 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984).

In *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), the Supreme Court considered the policies of the antitrust laws as enunciated in *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). In a footnote, the Court summarized the central implications of those cases.

If there is a subordinate theme to our opinions in *Hawaii* and *Illinois Brick*, it is that the feasibility and consequences of implementing particular damage theories may in certain limited circumstances, be considered in determining who is entitled to prosecute an action brought under § 4. Where consistent with the broader remedial purposes of the antitrust laws, we have sought to avoid burdening § 4 actions with damage issues giving rise to the need for "massive evidence and complicated theories," where the consequence would be to discourage vigorous enforcement of the antitrust laws by private suits. *Hanover Shoe, Inc. v. Unit-*

ed *Shoe Machinery Corp.*, [392 U.S. 481,] 493 [88 S.Ct. 2224, 2231, 20 L.Ed.2d 1231 (1968)] ... [W]hile "difficulty of ascertainment [of damages should not be] confused with right of recovery," *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 [66 S.Ct. 574, 580, 90 L.Ed. 652] (1946), § 4 plainly focuses on tangible economic injury. It may therefore be appropriate to consider whether a claim rests at bottom on some abstract conception or speculative measure of harm.

*Blue Shield*, 457 U.S. at 475 n. 11, 102 S.Ct. at 2546 n. 11.

In *Merican*, the Third Circuit discussed the focus of the inquiry for determining whether a plaintiff is within the class of persons considered to be injured in his business or property under section 4 by an antitrust violation. "[A] district court must focus on the possibility of duplicative recovery and the potential for overly-complex damage claims if a damage suit is allowed." *Merican*, 713 F.2d at 966.

### a. Duplicative Recovery.

■ The issue of duplicative recovery is related to the directness of the plaintiffs' alleged injury and the causal connection between the alleged violation and the plaintiffs. *See Associated General*, 459 U.S. at 540–543, 103 S.Ct. at 909–911. The possibility of duplicative recovery arises where more immediate victims of the alleged conspiracy would have a right to maintain their own treble damage suits. *Id.* at 541, 103 S.Ct. at 910. In this case, defendants claim, and I agree, that plaintiffs' theory of the alleged violation suggests that more direct victims are available to bring this suit.

TMI and Conference begin by noting plaintiffs' description of the market allegedly harmed by the conspiracy.

In the instant case, Defendants' conspiracy is focused on the Pennsylvania trucking market in which carriers contributing to the Fund [sic] do business. Plaintiffs contend that TMI, these local associations, and their member carriers are attempting to restrain competition in the dry freight trucking industry. In the

process, they are restraining competition in trucking industries outside the segment involving dry freight.

Motion for Partial Summary Judgment of Defendants TMI and Conference Directed to Antitrust Claims of ELAA and Employer Plaintiffs, Addendum, Exhibit C, at 7 [hereinafter, Motion on Antitrust Claims of ELAA].

Plaintiffs also allege that the Nationwide Network Carriers compete in the "less than truckload" submarket of the dry freight industry throughout the country. Second Amended Complaint, at 16, ¶ 35. From these two statements about the market allegedly restrained, defendants conclude that the market at issue is "that portion of the dry freight trucking market, and specifically the LTL submarket of the dry freight market which is covered by the ... Funds and in which the ... 'nationwide network carriers' compete." Motion on Antitrust Claims of ELAA, at 8.

On the other hand, according to deposition testimony of employer representatives, the Employer plaintiffs compete in a completely different market. Chemical and MTS haul liquid and dry cement. Schwerman hauls cement, liquids and products similar to fly ash. The employers concededly do not compete in the LTL or dry freight markets with Nationwide Network Carriers. In the words of one employer plaintiff representative, "[T]here's no comparison between [the cement industry] and freight. The problems are between apples and oranges." Motion on Antitrust Claims of ELAA, Addendum, Exhibit D–1, at 131, L. 22–24. Further, the employer plaintiffs do not participate in the TMI NMFA negotiations and are not parties to the TMI NMFA. Thus, TMI and Conference argue because the plaintiff in *Associated General* "was neither a consumer nor a competitor in the market in which trade was restrained," 459 U.S. at 539, 103 S.Ct. at 909, and the Employer plaintiffs in this case are not consumers or competitors of TMI, Conference or the employers they represent, the employer plaintiffs should be denied standing.

■ The Employer plaintiffs admit that they may not have been the intended victims of the conspiracy, but argue that the class of private attorneys general created under section 4 is not defined by the specific intent of the alleged conspirators. I agree. *Associated General*, 459 U.S. at 532–33 & nn. 25, 26, 103 S.Ct. at 905–06 & nn. 25, 26; *Merican*, 713 F.2d at 964 n. 13. Moreover, "[t]he availability of the § 4 remedy to some person who claims its benefit is not a question of specific intent of the conspirators." *Blue Shield*, 457 U.S. at 479, 102 S.Ct. at 2548. However, this does not end the inquiry.

Plaintiffs' theory of the case suggests that direct competitors of the companies defendants represent are available to bring this action. The causal link between the alleged conspiracy and the allegedly inflated fringe benefit costs paid by plaintiffs is the IBT on the national level, and the locals on the regional level. Plaintiffs have repeatedly reiterated that the union was not a wrongdoer in this case, it was "duped" into becoming the tool of the conspiracy. *See* Transcript of Oral Argument, at 31–33. The conspiracy was purportedly aimed at reducing competition in the dry freight market. Plaintiffs' Memorandum in Opposition, at 13.

Plaintiffs' alleged chain of causation involves several very tenuous links. First, the IBT on a national level had to be coerced into agreeing to higher fringe benefit rates when it would not be in their economic self-interest. Second, and most problematic, the competitors of the employers represented by TMI and the Conference in the dry freight market, or the LTL submarket, had to agree to higher contribution levels as a result of defendants' alleged coercion of the union. Third, the Employer plaintiffs' acquiescence to the union demand for higher fringe benefit contribution levels under EACHA and EATHA must somehow be linked to defendants' alleged manipulation of the IBT.

Thus, defendants' competitors in the dry freight and LTL markets would be more likely to be motivated by their own self-interest to pursue defendants for their alleged violations. *Associated General*, 459 U.S. at 540–41 & n. 44, 103 S.Ct. at 909–10 & n. 44; *Merican*, 713 F.2d at 965, n. 15. Although this suit was commenced more than two years ago, no direct competitors have come forward. In response, plaintiffs argue that none have come forward because they were denied access to a list of the employers who contribute to the Funds in 1985, and that had they been given the list in 1985, a number of direct competitors may have stepped forward to support this suit. This argument is spurious. Plaintiffs were provided with the list during the early stages of this litigation and, as yet, no direct competitors have come forward.

*b. The Nature of the Alleged Injury.*

. The *Associated General* court considered the speculative nature of a purported antitrust damage claim and whether it would lead to an overly-complex trial. *See Associated General*, 459 U.S. at 543, 103 S.Ct. at 911. As in *Associated General*, in this case, "nothing but speculation informs [plaintiffs'] claim of injury by reason of the alleged unlawful coercion." *Id.*

The Employer plaintiffs claim that TMI and Conference manipulated the IBT's national negotiating committee into agreeing to higher fringe benefit levels in the 1985 TMI NMFA negotiation. Further, they claim that TMI was able to "dupe" the IBT into "forcing" the higher fringe benefit levels onto the other carriers that are parties to other NMFA's.

Under plaintiffs' theory, therefore, they must prove the components of fringe benefit costs as follows:

1. The fringe benefit costs under the NMFA's in existence prior to the 1985 NMFA negotiations.

2. The amount of increase under the 1985 TMI NMFA attributable to "lawful" negotiation by the IBT.

3. The amount of increase under the 1985 TMI NMFA attributable to the alleged conspiracy.

4. The amount of increase in the 1985 MCLAC NMFA attributable to "lawful" negotiation by the IBT.

5. The amount of increase in the 1985 MCLAC NMFA attributable to the alleged conspiracy.

6. The amount of increase in the EACHA and EATHA agreements during the relevant period attributable to "lawful" negotiation by the IBT.

7. The amount of increase in the EACHA and EATHA agreements attributable to the alleged conspiracy.

Although the first item could be easily ascertained, plaintiffs present no evidence on which to base the other allocations, as further discussed *infra* Part II C. The problems of identifying and apportioning the Employer plaintiffs' damages among these factors are the precise problems the Supreme Court was concerned with in *Associated General* and *Illinois Brick*. *Associated General*, 459 U.S. at 545, 103 S.Ct. at 912; *Illinois Brick*, 431 U.S. at 737–38, 97 S.Ct. at 2070. The employer plaintiffs' damage theory is speculative, abstract and impractical. *Associated General*, 459 U.S. at 543 & n. 49, 103 S.Ct. at 911 & n. 9; *Blue Shield*, 457 U.S. at 475–76, 102 S.Ct. at 2546–47.

Employer plaintiffs also allege that the rules and documents related to employer participation in the Funds are designed to inflict other antitrust injuries. The resulting damage the Employer plaintiffs claim is difficult to characterize. The employers claim that they were forced to sign certain documents upon the threat of "being thrown out of the [Funds]." Plaintiffs' Memorandum of Law in Opposition to the Motion on the ELAA Antitrust Claims, at 4. Further, they claim that if they were thrown out of the Funds, they *may* have faced "substantial ERISA withdrawal lia-

bility." *Id.* Lastly, "[a]ll [employer] plaintiffs also *believed* ... that it was impossible to negotiate out of their contribution obligations to the Funds ... without a major labor dispute." *Id.* at 4–5 (emphasis added). As a result of "these 'conspiratorial rules,'" the Employer plaintiffs claim they were forced to continue contributing at artificially high contribution levels. *Id.*

First, plaintiffs produce no evidence that the documents were a product of TMI's or Conference's conduct. Second, although the documents relating to the Funds were the product of the Funds' trustees, plaintiffs produce no evidence to support their allegation that the documents are the result of action *solely* by the employer trustees.[9] Third, employer liability for withdrawals is a matter of ERISA law, not "threats." Fourth, the speculative nature of the damages claim is evidenced by plaintiffs' phraseology. They *may* have been thrown out of the Funds, they *believed* they would face ERISA withdrawal liability, they *may* have faced a major labor dispute if they withdrew from the Funds.

The purpose of the Sherman Act is to protect "economic freedom of participants in the relevant market." *Associated General*, 459 U.S. at 538, 103 S.Ct. at 908. Not only are these claims far removed from any reasonable interpretation of economic freedom in cognizable market, plaintiffs' claimed injuries are remediable under other laws. *Id.* at 543, 103 S.Ct. at 911. An unlawful threat of termination from the Funds, and the imposition of improper withdrawal liability are ERISA claims. *See* 29 U.S.C. §§ 1381–415. The remedy for unlawful labor activity is found in provisions of the National Labor Relations Act.[10]

---

**9.** Plaintiffs' position on this issue was stated by G.A. LeClaire, Chemical Leaman's authorized representative.

> Q. ... Your position, then would be that all four trustees of the ... Funds, as an example, participated in th[e] direction to Local 773 that it is not permitted to negotiate freely with Chemical Leaman Tank Lines on pension, health and welfare matters, is that correct; all four trustees are involved?
> A. All four trustees are the ones that are directed by the Funds, so I have to say all four trustees.

Plaintiffs' Memorandum in Opposition to Motion on ELAA Antitrust Claims, Exhibit 4 (Deposition of G.A. LeClaire, October 7, 1987) at 120.

I also note that Mr. LeClaire's testimony about Local 773's representation that it is not allowed to negotiate fringe benefit issues is inadmissible hearsay. Evidence supporting a motion opposing summary judgment must be in admissible form. Fed.R.Civ.P. 56(e).

**10.** The last issue intertwined with the employer plaintiffs' damage claim is the effect of deregulation and non-union competition in the trucking industry. This is addressed in connection

I conclude that plaintiffs' claims under the antitrust laws related to the Funds' documents could inflict no antitrust injury cognizable under the Sherman Act. *Associated General,* 459 U.S. at 543, 103 S.Ct. at 911; *Blue Shield,* 457 U.S. at 483, 102 S.Ct. at 2550; *Pueblo,* 429 U.S. at 487–89, 97 S.Ct. at 696–98.

In sum, the Employer plaintiffs lack standing to pursue their antitrust claims against defendants. The chain of causation is overly attenuated under plaintiffs' theory of the case. There exist direct competitors of the alleged violators who could bring a suit on the same theory. They have not. Plaintiffs' theory that they have sustained damages resulting from improperly inflated fringe benefit costs requires speculation[11] as to the source of the increases in contribution rates, and would lead to an unduly complex trial on damages. Plaintiffs' claim that the Fund documents they were required to sign is not cognizable under the antitrust laws. Lastly, plaintiffs present, at most, a bare scintilla of admissible evidence that the increase in fringe benefit costs was anything but the product of shrewd negotiation by the IBT and its locals.

### C. Antitrust Conspiracy Theory

 After a careful review of the submissions of the parties and the oral argument, I also hold, as an independent ground for granting summary judgment in favor of defendants on the section 1 claims, that plaintiffs' section 1 claim must fail under the summary judgment standards set forth in *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In *Matsushita,* the Supreme Court held that to survive a motion for summary judgment, the party opposing the motion must "establish that there is a genuine issue of material facts as to whether [defendants] entered into an illegal conspiracy that caused [plaintiffs] to suffer a cognizable injury." *Id.* at 585–86, 106 S.Ct. at 1355–56. Proof of the existence of a genuine factual issue has two components. Plaintiffs must show that the alleged conspiracy caused an "antitrust injury" as defined in *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 490, 97 S.Ct. 690, 698, 50 L.Ed.2d 701 (1977). *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. Second, plaintiffs must show that the issue is genuine and material. The proof of the conspiracy must be sufficient to support a verdict by a rational trier of fact in favor of plaintiffs, otherwise there is no genuine issue for trial. *Id.* at 587, 106 S.Ct. at 1356.

 In some instances, plaintiffs' economic theory of the alleged conspiracy may justify requiring "more persuasive evidence to support their claim than would otherwise be necessary." *Id.* Plaintiffs are held to the higher standard when their economic theory of the case is "implausible" in the sense that a rationally motivated economic actor would not engage in the conduct with only the hope of economic benefit at some future date. Because the acts which are alleged to be violations of section 1 must be evaluated in the factual context in which they occurred, *id.,* plaintiffs must show "that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed

with plaintiffs' economic theory of the case, discussed in Part II B.

11. Plaintiffs' lack of evidence on their damage theory was demonstrated during oral argument. Plaintiffs' counsel discussed the evidence supporting the theory that the contribution rate differential between casual and full time employees, and stated that no study had ever been made about the impact of this differential, and that the carriers represented by TMI used a far greater percentage of casual employees than did the employers plaintiffs represent. Transcript of Oral Argument, at 40–41. When I inquired about what evidence plaintiffs had to support

this claim, counsel referred to the deposition testimony of one individual, Hal Franke. *Id.* at 41.

I have reviewed carefully Franke's deposition testimony, and find nothing in it that provides any support for determining what extent the rate differential benefits the Nationwide Network Carriers, and harms the smaller carriers. Franke's unsupported assertion that the rate differential was designed to benefit the large carriers is insufficient to establish a basis for a jury finding on the amount of plaintiffs' compensable economic injury, if any.

the [plaintiffs]." *Id.* at 588, 106 S.Ct. at 1357; *see Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984); *First National Bank of Arizona v. Cities Service*, 391 U.S. 253, 280, 88 S.Ct. 1575, 1588, 20 L.Ed.2d 569 (1963); *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 473 (3rd Cir.1985). Finally, "evidence of an opportunity to conspire, although relevant, is not enough to sustain an antitrust plaintiff's burden, and, without more, does not create a jury question on the issue of concerted action." *Fragale & Sons*, 760 F.2d at 473; *Edward J. Sweeney & Sons, Inc. v. Texaco*, 637 F.2d 105, 115 (3rd Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); *see Nanavati v. Burdette Tomlin Memorial Hospital*, 857 F.2d 96, 120 (3d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989). I, therefore, turn to the nature of the alleged conspiracy and "the practical obstacles to its implementation." *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1357.

### 1. *The Alleged Conspiracy*

As stated previously, plaintiffs' theory of antitrust violations is embodied in three "manifestations" of the conspiracy. The allegations are 1.) TMI negotiated fringe benefit increases in the 1985 NMFA at artificially high levels with the intent of driving up the costs of its competitors; 2.) TMI and the Conference interfered with plaintiffs' independent negotiations with IBT locals by manipulating the locals to demand high rates from plaintiffs; and 3.) TMI and Conference "influenced" the Funds' trustees to implement rules and regulations to increase plaintiffs' fringe benefit costs. Plaintiffs' Consolidated Reply Memo, at 133.

Plaintiffs generally agree that their economic theory is analogous to a predatory pricing theory of fringe benefit costs, but argue that defendants exerted "conspiratorial pressure" in two ways. Plaintiffs argue that the competitive presence of the

Nationwide Network Carriers forced trucking rates down. Concurrently, plaintiffs allege defendants combined to push fringe benefit costs upward. The result, according to plaintiffs, is a conspiracy to force plaintiffs' prices lower, while plaintiffs' costs were increased. Plaintiffs' Consolidated Reply Memo, at 137.

Obviously, this theory suffers from insurmountable obstacles relative to plaintiffs and defendants participation in two entirely separate markets: the nationwide "LTL" market or dry freight market for defendants and the regional tank or cement haul markets for plaintiffs. Ignoring these problems, plaintiffs must show that the actions of the defendants is linked to the harm plaintiffs allegedly suffered. Plaintiffs claim that the expert report of Dr. James A. Clifton, Exhibit 94 to Plaintiffs' Consolidated Reply, shows "that the TMI has raised fringe benefit costs in the Central Pennsylvania region, as it has throughout the country increasing the costs of doing business, especially for the smaller regional carriers." Plaintiffs Consolidated Reply Memo, at 135.

 First, I note that the report is not in admissible form. Rule 56(e) requires in part that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). "The substance of the report was not sworn to by the alleged expert. Therefore, the purported expert's report is not competent to be considered on a motion for summary judgment." *Fowle v. C & C Cola*, 868 F.2d 59, 67 at 16 (3rd Cir.1989).

Setting aside this fatal defect in the sole piece of evidence on the issue, the report of Dr. Clifton primarily [12] discusses actions of the Nationwide Network Carriers who are not defendants to this case. Further, the report discusses evidence of "supercompetitive [sic] profits" earned by the Nationwide

---

12. The report also notes that the only competitive link between the defendants to this case and the plaintiffs is through MCLAC. *See* Figure

One. If anything, this report supports my holding on the standing issue.

Network Carriers in certain regions of the country. The conclusion most relevant to this case is that the patterns of profitability in the Eastern Central Region[13] show "a sustained and widespread pattern of predatory pricing by the [Nationwide Network Carriers]." This evidence, even if found sufficiently relevant to the actions within the Central Pennsylvania region to be admissible, is precisely the type of evidence the Supreme Court was skeptical of in *Matsushita. Id.* at 593, 106 S.Ct. at 1359 The Court found that such evidence is insufficient to survive a summary judgment motion "absent some strong likelihood that the alleged conspiracy ... will eventually pay off" in the defendants' market. *Id.*

Plaintiff argues that, based on the *projections* of Dr. Clifton, the Nationwide Network Carriers will control 96 per cent of the Eastern central market in *1997*. This projection does not discuss the competitive environment of the trucking industry since deregulation in 1980. *See* Second Amended Complaint at ¶ 133. Dr. Clifton's report ignores the economic reality that additional competitors are attracted to markets with supracompetitive profits.[14] His conclusion is a "metaphysical hope" of payoff for the Nationwide Network Carriers.[15]

Plaintiffs also argue that the establishment of so-called non-union, double-breasted companies is additional evidence of a conspiracy by the Nationwide Network Carriers to drive up the costs of unionized firms. Apart from the inferences plaintiffs contend should be drawn from the entire "mosaic" of evidence, there is no evidence in the record to conclude that the establishment of non-unionized affiliates is anything but "conduct as consistent with permissible competition as with illegal conspiracy." *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1357.[16]

Plaintiffs also set forth a lengthy theory of the origins of the TMI and Conference conspiracy. Plaintiffs Consolidated Reply Memo, at 142–50. This theory centers on the restructuring of TMI that occurred during the early 1980's. Plaintiffs claim that the process used and reforms enacted are "highly interesting and relevant" proof of the alleged conspiracy. This evidence is either legal action not remediable under the antitrust laws, action consistent with permissible competition and insufficient to support the inference of conspiracy urged by plaintiffs, or not in admissible form.

The heart of the allegations is that TMI was able to manipulate the IBT into forcing the higher fringe benefit costs onto non-TMI or Conference carriers. The evidence of antitrust conspiracy here is in plaintiffs' own terms, the "smoking gun" reference to the minutes of a TMI negotiating committee meeting held on January 27, 1985 in

---

**13.** The report describes the Eastern Central region as the area stretching north from Texas and New Mexico to North Dakota, and east therefrom to Maine, but excluding the southeastern quadrant of the United States.

**14.** Professor Areeda concisely summarized the economic behavior of actors in a market tending toward monopoly. *See* Areeda, ANTITRUST ANALYSIS 15 n. 33 (3rd ed. 1981). Once a firm begins to earn an "excess return", or "supracompetitive profits," new firms are attracted to the industry. The new firms provide additional supply, which causes a decrease in an individual firm's excess profits. "New entry will cease when *individual firm surplus profits are driven to zero.*" *Id.* at 16 n. 33. Plaintiffs' expert report ignores this critical economic behavior in reaching the conclusion that the Nationwide Network Carriers will begin to earn a return from their present anticompetitive behavior in 1997.

**15.** Plaintiffs also contend that non-unionized competition does not threaten the nationwide network carriers because there are no non-unionized carriers in the LTL market. Again, this is not evidence to support the inference of a conspiracy. According to plaintiffs, the Nationwide Network Carriers were able to obtain supracompetitive profits under the 1985 NMFA with allegedly illegally inflated fringe benefit costs. The profitability of a non-union competitor in the market under plaintiffs' theory would be "supra-supracompetitive" because the non-union competitor has a fringe benefit cost that is neither unionized nor inflated by the alleged conspiracy. This renders plaintiffs' claim concerning non-union competition highly implausible.

**16.** It is questionable whether the establishment of non-unionized affiliates in the context of this litigation is subject to review under the antitrust laws in the first place. *Cf. Associated General Contractors*, 459 U.S. at 526–27, 103 S.Ct. at 902–03.

which the phrase "antitrust implications" was used. The portion referred to states:

P.S. Do we expect MCLAC [to attend a negotiation session]?

J.F. Yes.

J.S. There are antitrust implications. Be careful.

P.S. Up until last week, TMI was to go it alone.

Plaintiffs' Consolidated Reply Memo, Exhibit 100(*o*) at 2. This statement supports the inference that TMI was being careful not to violate the antitrust laws equally as well as it supports the inference of pernicious activity. Moreover, it is hardly sufficient evidence to support a jury finding of a conspiracy of the magnitude plaintiffs claim existed.

■ At oral argument, plaintiffs' counsel also alluded to other TMI negotiating committee meetings in which antitrust advice was purportedly obtained from lawyers for TMI to support the inference of an antitrust violation during those meetings.[17] Using evidence of a meeting with antitrust counsel to suggest that an antitrust violation had occurred seriously undercuts the policies supporting the attorney client privilege. Plaintiffs' argument would permit the use of evidence of obtaining legal advice on a subject as evidence of a violation of law. Such evidence is clearly inadmissible, and cannot be used to defeat a summary judgment motion. Fed.R.Civ.P. 56(e). At best, plaintiffs' evidence shows that opportunities to engage in concerted action existed. Such evidence is not sufficient to survive a motion for summary judgment. *Fragale & Sons*, 760 F.2d at 473; *Edward J. Sweeney & Sons*, 637 F.2d at 115.

Concerning the conspiracy to inflate costs through the use of rules and documents associated with the Funds, apart from the fact that two of the trustees of the Funds are appointed by the Conference, plaintiffs present no evidence that TMI or Conference participated in any way in the formation or implementation of the Funds' rules or documents. Summary judgment on this allegation is therefore appropriate as to TMI and Conference. *Beutler Sheetmetal Works v. McMorgan & Co.*, 616 F.Supp. 453, 456–57 (N.D.Cal.1985).

■ It is also clear that the trustees were not in competition with the plaintiffs and that the trustees were acting in their fiduciary capacities when they adopted the complained of policies. I join the other courts that hold that in such circumstances, the trustees are incapable as a matter of law of engaging in an antitrust conspiracy with the Funds. *Golden v. Kentile Floors, Inc.*, 475 F.2d 288, 290 (5th Cir.1973); *Austin v. House of Vision, Inc.*, 404 F.2d 401, 403 (7th Cir.1968); *Beutler Sheetmetal*, 616 F.Supp. at 457–58; *Graham v. Hudgins, Thompson, Ball & Associates, Inc.*, 319 F.Supp. 1335, 1337 (N.D.Okla.1970).

At bottom, plaintiffs' economic theory of the case is highly implausible. Defendants and the Nationwide Network Carriers would have to sustain increased fringe benefit costs themselves in an admittedly increasingly competitive market. The increasing competition was in part from non-union companies with dissimilar and lower labor costs. Plaintiffs' economic theory also contemplates that the IBT agreed to the higher fringe benefit rates for reasons other than the economic benefit of its membership. Plaintiffs present no evidence

---

**17.** Plaintiffs rely on agendas of various TMI meetings to support their claim that antitrust violations occurred. The agenda items and other evidence show that antitrust implications were discussed. During oral argument, counsel for plaintiffs stated:

I think going back to the one question about admissible evidence and why in this ... particular case[,] it was very difficult to find the smoking gun, there was no smoking gun in this particular case except the internal meetings of TMI. And again I would suggest that while you Honor has precluded us from getting into meetings where there was a lawyer screening those meetings, it is admissible evidence to look at the outlines of the discussions that took place during those meetings and take inferences from those discussions. The subject matter of the discussions themselves are such that antitrust activity is clearly evident on the face of those discussions.

Transcript of Oral Argument, at 43.

During discovery, I barred plaintiffs from obtaining copies of the minutes of these meetings based on defendants' claim of attorney-client privilege.

which is not equally consistent with competitive behavior by TMI as it is with the inference of antitrust conspiracy.

■ In fact at oral argument, counsel for plaintiff conceded that "[plaintiffs] need lots of inferences in this case.... [They] need inferences from a look at the entire set of facts...." Transcript of Oral Argument, at 28–29, and 27. Plaintiffs cannot survive a motion for summary judgment based entirely on inferences. I shall therefore grant summary judgment in favor of defendants on Counts XI and XII.[18]

### III.

### *The LMRA Claims*

Section 302(a)(1) makes it unlawful "for any employer or association of employers ... to pay ... any money or other thing of value to any representative of any of his employees...." 29 U.S.C. § 186(a)(1). An exception to this general prohibition is found in section 302(c)(5)(B), 29 U.S.C. § 186(c)(5)(B), which allows employers to make payments to trust funds established by representatives of the employees provided that the employees and employers are equally represented in the administration of the funds. The equal representation requirement was designed primarily to limit "possible abuse by union officers of the power which they might achieve if welfare funds were left solely to their sole control." *Arroyo v. United States*, 359 U.S. 419, 426, 79 S.Ct. 864, 868, 3 L.Ed.2d 915 (1959); *see*

*National Stabilization Agreement of Sheetmetal Industry Trust Fund v. Commercial Roofing & Sheetmetal*, 655 F.2d 1218, 1223 & n. 6 (D.C.Cir.1981), *cert. denied*, 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed. 2d 447 (1982); *Denver Metropolitan Association of Plumbing, Heating, Cooling Contractors v. Journeyman Plumbers & Gasfitters Local No. 3*, 586 F.2d 1367, 1374–75 (10th Cir.1978).

■ Plaintiffs claim that the trust agreements governing the Funds are "structurally defective" because the Employer Trustees of the Funds are appointed solely by the Conference. This, according to plaintiffs, allows the IBT to dominate the management of the Funds, in violation of plaintiffs' right to "equal representation" under section 302(c)(5)(B) of LMRA. Plaintiffs request that I enter an order declaring the Funds structurally defective and reforming the Funds in a manner consistent with section 302. According to plaintiffs, to make the agreements consistent with section 302, they, and all independent employers, must be given the right to vote on and nominate employer trustees.

### A. Factual Background

Plaintiffs' theory of violations of LMRA is wholly separate from their theory of antitrust violations. As discussed above, the central theory of antitrust conspiracy involves allegations that TMI and Conference were able to "dupe" IBT on a nationwide level. To understand plaintiffs'

---

18. Concerning plaintiffs' section 2 claims, there is almost a complete lack of evidence on the substance of these claims.

To prove a section 2 violation, plaintiffs must prove either a monopolization or attempted monopolization. Both require plaintiffs to present sufficient evidence to permit a jury to find that defendants possessed the requisite market power necessary to constitute a monopoly. *See American Bearing Co. v. Litton Industries, Inc.*, 729 F.2d 943, 949 (3rd Cir.), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984). Plaintiffs allege that defendants are engaging in monopoly or attempted monopoly of the market for collective bargaining services in the trucking industry in the Pennsylvania region. However, they fail to produce any evidence beyond the mere allegations of the complaint that this market is recognized by the industry or public as a separate economic entity or submarket. *United*

*States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 393, 395, 399–400, 76 S.Ct. 994, 1006, 1007, 1009–1010, 100 L.Ed. 1264 (1956). "Without a definition of the relevant market, defendant's ability to exclude competitors cannot be determined." *American Bearing*, 729 F.2d at 949.

Of the hundreds of pages of briefing submitted by plaintiffs in response to the instant motions, plaintiffs devote approximately one page to their section 2 claims. That page does not include a reference to any evidence in the record. Plaintiffs' Consolidated Reply Brief, at 168–69. Further, there is no factual basis to support the claim that the Funds and trustees were monopolizing, or attempting to monopolize, a cognizable market. Summary judgment on plaintiffs' section 2 claims for lack of evidence is therefore proper.

claims of union domination, a detailed review of the history of the Funds is necessary.

That history begins in the early 1950s, when IBT Local 429 determined it was in the best interests of its members to form a health and welfare fund and a pension fund. A Declaration of Trust dated July 24, 1952, formed the Health and Welfare Fund involved in this dispute. The original trust agreement is between IBT Local 429 and the Conference as successor to Highway Transportation Association, Reading–Allentown Division, Inc. ("HTA"). The Pension Fund which is involved in this dispute was also created by IBT Local 429 and HTA under a Declaration of Trust dated September 1, 1955.[19] The costs of forming the pension fund were originally advanced by Local 429 and later reimbursed by the Fund itself.

The original trust agreements for the Funds provide for the appointment of trustees. The relevant provision states in part:

> The Trustees shall consist of one or more persons designated by the EMPLOYER, or EMPLOYERS acting as a group, ASSOCIATIONS, representing OPERATORS and other EMPLOYERS governed by this Agreement, and an equal number of persons designated by the UNION and representing the employees. Unless and until the parties otherwise agree, there shall be two Trustees representing the EMPLOYER, OPERATORS or ASSOCIATIONS and other EMPLOYERS to be governed by this Agreement, and two Trustees representing the UNION. The UNION Trustees shall be appointed by the UNION.... The Trustees representing the EMPLOYER, OPERATORS or ASSOCIATIONS, and other EMPLOYERS to be governed by this Agreement, shall be appointed by the EMPLOYERS, or EMPLOYERS acting as a group, and a written certification by the EMPLOYER or President or Secretary of said group or ASSOCIATIONS, shall be satisfactory evidence of such appointment.

Second Amended Complaint, Exhibit 11 at 1.[20]

The individual employer plaintiffs began contributing to the Funds by executing copies of the trust agreement and Exhibit A at different times between 1960 and 1966.

The two original "employer trustees" for both Funds were Paul B. Kemmerer and Leonard Levin. Both were designated by HTA. Kemmerer is shown as the Secretary of HTA on the original trust agreement. While the evidence in the record is unclear as to the reason for the selection of Levin,[21] Levin was neither employed by nor a member of HTA at the time of his appointment as a trustee of the Funds. Levin served in that capacity until 1980.

The next series of significant events about which plaintiffs complain occurred in 1974. At about the same time that Congress was considering the Employee Re-

---

**19.** Significantly, the original pension trust agreement delineates the parties as

Central Pennsylvania Motor Carriers Conference, Inc. Successor to Highway Transport Association, Reading–Allentown Division, Inc. hereinafter referred to as "EMPLOYER", "EMPLOYERS", "GROUP OF EMPLOYERS" or "ASSOCIATION", acting for and on behalf of the corporations, partnerships and individuals [who were listed as signatories to the agreement] and [IBT Local 429]....

**20.** The trust agreement also contained a provision called "Exhibit A" which reads:

We, the undersigned EMPLOYER, do hereby agree ... to become bound by all of the terms and provisions of the foregoing Trust Agreement, as well as the Pension Plan, a copy of which has been exhibited to the EMPLOYER and approved by the EMPLOYER, and as the same may be modified from time to time, just as though the undersigned was one of the original parties to the aforesaid Trust Agreement.

**21.** Exhibit 81 to Plaintiffs' Consolidated Reply Memo contains a Department of Labor Report of Interview from an investigation it conducted in 1977. In that document, the Funds' original counsel suggests that Levin was appointed at the request of the union because the union was familiar with Levin from dealings with him on other matters. Plaintiffs apparently acknowledge that the admissibility of this document at trial is doubtful, but ask that I consider it "important evidence" for purposes of these summary judgment motions. As Fed.R.Civ.P. 56(e) requires that all supporting evidence that is presented at the summary judgment stage be admissible, and the document clearly would not be admissible at trial, I shall disregard it.

tirement Income Security Act ("ERISA"), in July, 1974, the attorney for the Funds drafted several amendments to the Pension Fund. Among the amendments, the trustee appointment clause of the trust was amended to read as follows:

> The Trustees shall consist of one or more persons designated by the CONFERENCE on behalf of the EMPLOYERS governed by this Agreement, and an equal number of persons designated by Local 429 of the Union representing the employees.

Also included in this version was an "Exhibit A" which was to be executed by the employers who contributed to the Fund. "Exhibit A" bound the employers to the terms and conditions of the Pension Fund as set forth in the trust agreement.[22]

This version of the trust agreement was sent to the chairman of the Pension Fund with a cover letter dated July 3, 1974. The cover letter states that the agreement should not be printed until "the new Pension Bill is final" because further changes may be necessary. Minutes from the trustees' meeting of October 8, 1974 state that a "revised Trust Agreement" was executed by the trustees and would "be sent to the printer for printing."

According to the uncontroverted affidavit of the Funds' counsel, Harry A. Dower, because of the various amendments to the Funds required by ERISA, the complexity of the multi-employer pension fund, changes made pursuant to comments made by the Department of Labor, and delays within the Internal Revenue Service, the pension fund did not receive a favorable determination of its tax free status under the relevant income tax regulations until late July, 1979. Only after that time, almost five years after the 1974 changes were adopted by the trustees, was the trust agreement sent to the printer for distribution.

When the trust was printed in 1979 or 1980, it contained exactly the same trustee appointment clause as the 1974 version. "Exhibit A" from the 1974 version was deleted and a paragraph called "Joinder By Employer and Limited Power of Attorney"[23] was added in its place. Evidence in the record suggests that the printed version of the trust agreement was sent to the individual employers in August, 1980. *See* Plaintiffs' Consolidated Reply Memo, Exhibit 38.

When the revised trust agreement was sent to the individual employers, the ELAA employers who are parties to this suit through their counsel objected to their being requested to sign the trust agreement on several grounds. First, contrary to the documents they signed in the 1960's, they claimed they never had been asked to sign a trust agreement. Second, they inquired as to why the joinder provision was dated on the date the employers first began making contributions to the fund. Third, the employers "requested the legal basis upon which the Fund [wa]s requesting that the employer individually sign the Pension Plan[.]" Plaintiffs' Consolidated Reply Memo, Exhibit 38.

The response of Dower to this letter was quite terse. It suggested that he had already had discussions with someone from

---

**22.** Exhibit A states:

> We, the undersigned EMPLOYER, do hereby agree ... to become bound by all of the terms and provisions of the foregoing Trust Agreement, as well as the Pension Plan, a copy of which has been exhibited to the EMPLOYER and approved by the EMPLOYER, and as the same may be modified from time to time, just as though the undersigned was one of the original parties to the aforesaid Trust Agreement.

**23.** The paragraph reads:

> The undersigned Employer does hereby agree ... to be bound by all terms and provisions of the foregoing Trust Agreement, and as the same may be amended or modified from time to time, and does hereby designate and appoint the CENTRAL PENNSYLVANIA MOTOR CARRIERS CONFERENCE, INC., or its successor, as its agent to enter into any amendments or modifications to the foregoing Trust Agreement except any amendment which would increase the obligation of the Employer to contribute money (exclusive of interest and penalties for late payments) to the ... Pension Fund (and as to the latter, the Employer's obligation shall be limited to the amount set forth in its Collective Bargaining Agreement, and not otherwise), and all such amendments shall be binding upon the Employer, just as though it were one of the original parties to such Trust Agreement or amendment.

the office of counsel for the ELAA employers on this subject, and stated that the execution of the trust agreement was required by Section 302(c)(5) of the Taft-Hartley Act. Counsel for the ELAA responded with a terse letter of his own, stating that he disagreed with Dower's interpretation of § 302(c)(5). His major concern in executing the documents was a desire that his clients not enter into any agreement which could be construed as a contract obligating the employers to provide pensions for employees. That obligation, in his opinion, was strictly an obligation of the Funds; the employers' sole obligations were to make contributions to the Funds as required by the collective bargaining agreements. No response to this letter is included in the record.

The final series of significant events which plaintiffs claim show union domination of the trustees is the day-to-day management of the Funds. The following is a list of the alleged facts [24] that plaintiffs claim show union domination:

1. Local 429 advanced the start-up costs for the Funds and was later reimbursed by the Funds for those costs.

2. The Funds' operations are housed in a building owned by Local 429.

3. In the early 1970s, Local 429 moved to a new building, and decisions about what space the Funds would occupy in the building was made by an assistant in charge of the Funds' operations and with the architect hired by Local 429.

4. Local 429 has always appointed the Chairman of the Funds, now called the Administrator, and the employers have always appointed the Secretary, now called Assistant Administrator. The Administrator receives a $20,000 annual salary and the Assistant Administrator receives $8,000 from each Fund.

5. The Funds entered into an "Administrative Service Contract" with Local 429. Under the contract, Local 429 submits bills for reimbursements of its overhead costs, under an allocation formula to the Funds. Under the contract, the Funds pay the majority of expenses related to the operation of the building.

6. The allocation formula in the contract was developed and administered by the Funds' accountant who is also the accountant for Local 429.

7. A variety of complaints concerning the compensation and benefits system for the Funds' trustees.

8. The trustees' methods of handling contribution requirements for "casual employees" and payments by contributing employers.

According to plaintiffs, these allegations show a pattern of union domination of the management of the Funds which is a "structural defect" mandating reformation of the employer trustee appointment process.[25] At the outset, I note that some of

---

24. The mammoth nature of this case is evidenced by the more than fifty pages plaintiffs use to develop these allegations. Plaintiffs' Consolidated Reply Memo, at 49–100.

25. Plaintiffs' complaint seeks various forms of declaratory and injunctive relief which would allow the independent employers a voice in the selection of the employer trustees to remedy the alleged structural defects. *See* Second Amended Complaint at ¶¶ 93(a), 109. This is somewhat at odds with the statements of plaintiffs' counsel during oral argument. *See* transcript of Oral Argument at 78–79 ("[At] the very least [what] should happen in this particulaar case is some kind of independent voice, some kind of independent eye should be placed over the operation of this [sic] Fund.").

Assuming that plaintiffs seek a voice in the selection of employer trustees, that is a matter of contract under the various agreements. Plaintiffs raise no challenge to their voluntary agreement to enter into the plan agreements, such as fraud, duress, or surprise, aside from their generalized assertion that the IBT took the practical bargaining position that participation in the Funds was not a subject of bargaining.

It is clear from the testimony of virtually all Plaintiff employer representatives that participated in bargaining with the local unions, that the unions considered participation in the Teamster funds, especially the pension funds, non-bargainable issues *from a practical viewpoint* during the 1970's and early 80's. It is true that under the law, all such issues were legally bargainable. If as a practical matter, however, no employer could effectively withdraw from these Funds without an extensive and clearly destructive strike, the *net* effect is the same. The issue becomes practically, [sic] "non-bargainable" for that employer and participation in the Funds becomes effectively mandatory. Obviously it may be a *factual* question as to whether a "practical" non-bar-

these allegations are covered by specific exemptions from ERISA, *see* Prentice Hall, *Pension and Profit Sharing*, ¶ 21,701 (1984), are explainable by the union's concern for the welfare of its employees, consistent with fiduciary duties of the trustees or explainable by facts.[26]

### B. Summary Judgment

The standard for summary judgment on the section 302(c)(5)(B) claims is familiar. Summary judgment is appropriate if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Small v. Seldows Stationery*, 617 F.2d 992, 994 (3d Cir.1980). The court does not resolve questions of disputed fact, but simply decides whether there is a genuine issue of fact which must be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Ettinger v. Johnson*, 556 F.2d 692 (3d Cir.1977). The facts must be viewed in the light most favorable to the opposing party, and reasonable doubt as to the existence of a genuine issue of material fact is to be resolved against the moving party. *Continental Insurance Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.1982). However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The inquiry is whether the evidence presents a sufficient disagreement to re-quire submission to the jury, or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 252, 106 S.Ct. at 2512.

■■■ I begin with a basic premise of section 302(c)(5)(B). There is no requirement under ERISA or LMRA that an employer who contributes to a multi-employer welfare fund be given a voice in selecting the employer trustees. *Associated General Contractors of Essex County, Inc. v. Laborers International Union of North America*, 559 F.2d 222, 227 (3rd Cir.1977); *Blassie v. Kroger Co.*, 345 F.2d 58 (8th Cir.1965); *Local 169, International Brotherhood of Teamsters v. Teamsters Health & Welfare Board*, 327 F.Supp. 260 (E.D.Pa. 1971).

The duties and burdens of the trustees of all employee welfare plans under the Employment Retirement Income Security Act, are upon the individuals who serve. They must act solely in the interests of the plan participants, 29 U.S.C. § 1104(a), may not represent an interest adverse to the plan beneficiaries, *id.* at § 1106(b)(2), and are personally liable in damages for breach of trust. *Id.* § 1109(a). The appointing authority is not responsible for the acts of the fiduciaries, unless upon some negligent selection theory. The briefs state, without contradiction, that all expenses ... are paid from the trusts, and that insurance protecting the trustees from personal liability has been procured and paid for from trust assets. The employer trustees are still employer

gainable participation makes that participation legally "mandatory" or "voluntary" on an employer under a given set of facts. These facts should, however, be tested by a trier of fact.
Consolidated Reply Brief, at 21–22.
First, there is no evidence in the record to suggest that any of the defendants to this lawsuit were responsible for the "practical" bargaining position that the IBT may have taken with respect to participation in the Funds. Second, if true and in fact a subject that plaintiffs raised during the course of bargaining with the IBT, this be a basis for a charge under section 8 of the Labor Management Relations Act, 29 U.S.C. § 158. The appropriate "trier of fact" for this dispute is the National Labor Relations Board, if sufficient facts exist to support the allegation.

I note, however, that the record contains no evidence that plaintiffs made more than a passing attempt to bargain over this issue with the IBT. Third, viewed in the light most favorable to plaintiffs, therefore assumed as true, this collective bargaining issue does not support a claim of union domination of trust funds under section 302, only a refusal to bargain in good faith by the IBT.

**26.** For example, plaintiffs make much of the fact that the Funds pay the majority of the operating expenses of the building which is also the union office. That is true. However, it appears that personnel employed in administering the Funds occupy the vast majority of space in the building.

representatives and there may still remain problems to be worked out reconciling trustee responsibilities under ERISA with Section 302 of the LMRA. But we do not see any substantial burden upon the associations here in any way inimical to the purposes of the law.

*Denver Metropolitan,* 586 F.2d at 1375.

While this seems to foreclose the majority of plaintiffs' allegations from supporting a claim of union domination, plaintiffs have built the case on a theory expressly not included in *Denver Metropolitan;* "that the employer trustees are subservient to the union[ ]." *Id.* Fortunately, however, the parties agree that only three cases are applicable to the disposition of the summary judgment motions of plaintiffs' section 302 claims.

First, in *Quad City Builders Association v. Tri–City Bricklayers Union No. 7, AFL–CIO,* 431 F.2d 999 (8th Cir.1970), a declaratory judgment action was brought by a builders association who contributed to a welfare fund, claiming that the selection method of employer trustees violated section 302(c)(5)(B). Under the relevant agreements, the employer trustees were selected by a vote of ten employers, eight of whom were also members of the union. *Id.* at 1003. Because the employers who were members of the union represented a controlling majority of the employers eligible to vote on employer trustees, the court found that the selection method violated section 302. "The statutory standard under § 302 is a requirement placed upon the parties by law, and to permit the Union 'in any degree' to participate in the choice of employer representations [sic] violates this specific standard." *Id., quoting Employing Plasterers' Association of Chicago v. Journeymen Plasterers' Protective Association & Benevolent Society of Chicago, Local No. 5,* 279 F.2d 92, 97 (7th Cir. 1960).[27]

In *Associated Contractors of Essex County, Inc. v. Laborers International Union of North America,* 559 F.2d 222 (3rd Cir.1977), the court discussed the application of section 302 to a series of employer trustee selection amendments to welfare plans. The original trust agreement provided for the appointment of six trustees; three representing one employer association, and three representing the union. When a new employer association was formed, the employer association that previously selected the employer trustees moved to remove one employer trustee who declared his allegiance to the rival employer association. The new employer association demanded that it receive trustee representation equal to that of the old employer association. Accordingly, the trusts were amended to provide for eight trustees in total; four representing the union, two representing the old employer association and two representing the new employer association. *Id.* at 224.

The Third Circuit summarized the inquiry under section 302(c)(5)(B).

Our task is to examine the challenged amendments not only in their present form but, more importantly, as to their probable future effect. The question we must pose is whether the amendments, if allowed to stand, will permit union control of the carefully guarded structure which houses the fair and sound administration of trust funds. Some courts and commentators have concluded that the goal of equal representation in the administration and control of trust funds is defeated if the union in any degree participates in the choice of employer representatives; that the equal representation clause is violated by any arrangement which creates the possibility of union domination; and, indeed, that the essence of equal representation is that each side have veto power on any proposed action. We agree with such views.

. . . .

If the amendments here at issue create the potential of abuse by effectively placing the union in a position of control or dominance, they cannot be allowed to stand, even if the union's conduct this far has been irreproachable. Section 302 is

---

**27.** I note that plaintiffs point to no admissible evidence that the IBT or any of its locals have impermissibly influenced the selection of employer trustees.

designed to prevent future misconduct, not merely to remedy past misdeeds.

*Id.* at 227 (citations omitted).

Because the amendments at issue showed that the rival employer groups could be "divided and readily subjugated" to the union's position, the court held that "[section 302(c)(5)(B)] is violated when employer trustees representing a rival association not a party to the original trust agreement are added to the board without the consent of the original employer association." *Id.* at 228.

Lastly, in *Hot & Cold Insulation Contractors of New Jersey v. Local 32, International Association of Heat & Frost Insulation and Asbestos Workers,* 127 LRRM 2565 (D.N.J.1987), Judge Barry was faced with a situation where the employer association had consented to the representation of rival, independent employers on the trustees' board, unlike *Associated General.* After setting aside the issue of a possible failure to join indispensable parties, *id.* at 2573–74, as I do here,[28] Judge Barry concluded that the facts of the case supported the conclusion that the union dominated the board.

> Here, the subtle but steady erosion of equal representation and neutral administration has occurred. The Union's attorney has become the Funds' attorney. The Union's accountant is the Funds' accountant. The Funds' Manager, also the Union's financial secretary, administers the fund from the office of the union, utilizing its employees, and with the advice, assistance and consent of the union officers and its attorney becomes the sole and exclusive decision maker as to *the all important question of delin-*

*quent contributions.* Even assuming that such a state of affairs does not amount to a violation of the neutral persons clause of section 302, *the most telling event is the fact that when the employer trustees sought to halt this clear violation of both the trust agreement and LMRA itself, the independents voted with the union.*

*Id.* at 2576 (emphasis added).

Thus, the court held that the inclusion of the independent employer trustees who repeatedly voted with the union on matters that clearly violated LMRA and ERISA, violated the equal representation requirement of section 302. *Id.* at 2576, 2579–80.

After careful review of the numerous facts that plaintiffs claim show union domination, I am unable to find facts which clearly show union domination, as existed in *Hot & Cold Insulation.*[29] Plaintiffs point to no vote, or voting pattern, on matters which constitute clear violations of a trustee's obligation as a fiduciary which suggests that the union trustees' desires are readily acquiesced to by the employer trustees. On this record, I cannot conclude that there are disputed material facts which, viewed in the light most favorable to plaintiffs, could show an "evil alliance" between the employer trustees and union trustees which has operated to the detriment of the employee beneficiaries. *See Associated Contractors,* 559 F.2d at 229. Moreover, not one material fact adduced by plaintiffs in support of their claim of structural defect was allegedly committed by any defendants to this action with the intent to influence a union trustee in the conduct of his duties as a trustee to the

---

**28.** Unlike any other section 302 case I have located, plaintiffs chose not to join either the IBT or Local 429 to these claims. Clearly, Local 429 and the IBT may be indispensable parties under Fed.R.Civ.P. 19(a), as the relief plaintiffs seek, a reformation of the trust agreements to allow for an equitable distribution of the employer trustee selection methods would have some affect on the rights of the union to appoint trustees and the administration of the Funds. However, in view of my conclusion that plaintiffs fail to produce evidence of a structural defect, I need not examine this issue further.

**29.** In *Mobile Mechanical Contractors Association, Inc. v. Carlough,* 382 F.Supp. 1134 (S.D.Ala. 1974), Judge Hand found a structural defect in the appointment process of employer trustees because the union could add additional union trustees, but could also prevent the appointment of additional employer trustees. *Id.* at 1136. This case further supports my conclusion that there must be some clear showing that the union is able to manipulate or control the employer trustees in order to prevail on a section 302(c)(5)(B) claim.

Funds. *See Haley v. Palatnik,* 509 F.2d 1038, 1041 (2d Cir.1975).

Perhaps, viewed in the light most favorable to plaintiffs, some of their factual allegations may support claims of breaches of fiduciary duty. "[Plaintiffs] cannot prevail, however, if they merely seek to litigate their claim of breach of fiduciary duty under section 186: a simple breach of fiduciary duty in the administration of a pension trust covered by section 186(c)(5) does not amount to a 'structural' defect." *Baum v. Nolan,* 853 F.2d 1071, 1075 n. 2 (2d Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1313, 103 L.Ed.2d 582 (1989); *see Haley v. Palatnik,* 509 F.2d 1038, 1040 (2d Cir.1975).

Section 302 is also concerned with the "probable future effect" of trustee selection methods. *Associated General,* 559 F.2d at 227. If I granted the relief plaintiffs seek, the imposition of an "independent eye" over the Funds by reforming the employer trustee selection provisions to provide for the equitable distribution of trustee selection power, I may well be upsetting the applecart. This is the precise issue that concerned the Third Circuit in *Associated Contractors.* The possibility of a successful "divide-and-conquer" strategy is clear. "The result would necessarily be to increase the power of the union representatives as against the employer representatives at the expense of the balance designed for the protection of employee beneficiaries of the fund." *Associated Contractors,* 559 F.2d at 228. That outcome being contrary to the purposes of section 302(c)(5)(B), I hold that plaintiffs cannot obtain the relief they seek under section 302(c)(5)(B) and (e) without showing the existence of a pernicious alliance operating to the detriment of the Funds' beneficiaries. Without such a showing, there is no right to a voice in the selection of the employer trustees. *Associated General*

*Contractors,* 559 F.2d at 227; *Blasie,* 345 F.2d 58; *Local 169,* 327 F.Supp. 260.

Plaintiffs fail to show the existence of any alliance operating to the detriment of the beneficiaries. At best, plaintiffs may have shown isolated possible incidents of breaches of fiduciary duty which are remediable under other causes of action.[30] Such facts do not warrant reformation of the trust agreements. *Cf. Hot & Cold Insulation,* 127 LRRM at 2580 ("It must be remembered that, while it may be regulated by federal statutes, the relationship between the parties to this case is essentially a consensual, contractual one.").

## IV.

### *Conclusion*

Summary judgment in favor of defendants on plaintiffs' antitrust claims is appropriate. ELAA and MCLAC lack standing to bring an antitrust action against defendants. The Employer plaintiffs also lack standing under antitrust laws to challenge the behavior alleged in the complaint. The chain of causation is attentuated and the plaintiffs' damage theory is speculative and unduly complex. Further, in the alternative, plaintiffs have not introduced evidence which, when viewed in light of the competing inference of lawful competitive activity, supports a plausible theory of antitrust conspiracy. The record is also devoid of evidence to support the monopoly or attempted monopoly claims under section 2 of the Sherman Act.

Setting aside the difficulties of the failure to join the IBT or Local 429 to the section 302 claims, summary judgment on those claims is also appropriate as a matter of law. Plaintiffs do not provide evidence of union domination of the Funds operating to the detriment of the Funds' beneficiaries. Because section 302 was created to reduce, not enhance, the possibilities for

**30.** Various other counts of the Second Amneded Complaint claim breaches of fiduciary duty under ERISA. It appears that some of the facts alleged to support plaintiffs' structural defect claims may be time barred if used to support a claim of breach of fiduciary duty under ERISA. *See Baum,* 853 F.2d at 1075 (acts which oc-

curred before January 1, 1975 cannot support breach of fiduciary duty under ERISA, even if the complained of acts generate consequences after ERISA's effective date). However, I leave for another day the merits of plaintiffs' breach of fiduciary duty claims.

union domination of welfare funds, on the facts of this case, plaintiffs cannot obtain a reformation of the trust agreements. Moreover, there is no evidence to support the claim that defendants illegally coerced plaintiffs to enter into collective bargaining agreements with the IBT and various locals which require contributions to the Funds. At best, the evidence offered in support of the union domination claims may provide a factual basis for other counts in the complaint.

An appropriate order follows.

### ORDER

Upon consideration of the motions by defendants for Partial Summary Judgment, plaintiffs' responses, the supporting exhibits, the oral arguments of counsel, and for the reasons stated in the foregoing opinion,

1. The partial summary judgment motion of defendants Trucking Management, Inc. and the Central Pennsylvania Motor Carriers Conference, Inc. directed to Counts XI and XII is GRANTED. Judgment shall be entered in favor of defendants Trucking Management, Inc. and the Central Pennsylvania Motor Carriers Conference, Inc. and against plaintiffs Chemical Leaman Tanklines, Inc., Materials Transports Services, Inc., Schwerman Trucking Company, and Eastern Labor Advisory Association on counts XI and XII of the Second Amended Complaint.

2. The partial summary judgment motion of defendants Trucking Management, Inc. and Central Pennsylvania Motor Carriers Conference, Inc. directed to Counts II, III, IV, VI, VII, XI and XII is GRANTED. Judgment shall be entered in favor of defendants Trucking Management, Inc., and Central Pennsylvania Motor Carriers Conference, Inc. and against all plaintiffs on counts II, III, and IV. Judgment shall be entered in favor of defendants Trucking Management, Inc. and Central Pennsylvania Motor Carriers Conference, Inc. and against Motor Carriers Labor Advisory Council, Chemical Leaman Tanklines, Inc., Materials Transports Services, Inc., Schwerman Trucking Company, and Eastern Labor Advisory Association on count VI and count VII to the extent it seeks equitable relief under LMRA. Judgment shall be entered in favor of defendants Trucking Management, Inc. and Central Pennsylvania Motor Carriers Conference, Inc. and against Motor Carriers Labor Advisory Council on counts XI and XII.

3. The partial summary judgment motion of defendants Central Pennsylvania Teamsters Health and Welfare Fund and Central Pennsylvania Teamsters Pensions Fund, and their Trustees directed to counts VII, XI, and XII is GRANTED. Judgment shall be entered in favor of defendants Central Pennsylvania Teamsters Health and Welfare Fund and Central Pennsylvania Teamsters Pensions Fund, and their Trustees, and against Motor Carriers Labor Advisory Council, Chemical Leaman Tanklines, Inc., Materials Transports Services, Inc., Schwerman Trucking Company, and Eastern Labor Advisory Association on count VII to the extent it seeks equitable relief under LMRA, and counts XI and XII.

4. The partial summary judgment motion of defendants Central Pennsylvania Teamsters Health and Welfare Fund and Central Pennsylvania Teamsters Pensions Fund, and their Trustees directed to counts II, III, IV, V, VI, VIII, and X is GRANTED IN PART. Judgment shall be entered in favor of defendants Central Pennsylvania Teamsters Health and Welfare Fund and Central Pennsylvania Teamsters Pensions Fund, and their Trustees, and against all plaintiffs on counts II, III, IV, and V. Judgment shall be entered in favor of defendants Central Pennsylvania Teamsters Health and Welfare Fund and Central Pennsylvania Teamsters Pensions Fund, and their Trustees, and against all plaintiffs on counts II, III, IV, and V. Judgment shall be entered in favor of defendants Central Pennsylvania Teamsters Health and Welfare Fund and Central Pennsylvania Teamsters Pensions Fund, and their Trustees, and against Motor Carriers Labor Advisory Council, Chemical Leaman Tanklines, Inc., Materials Transports Services, Inc., Schwerman Trucking Company, and Eastern Labor Advisory Association on count VI. Judgment shall be

entered in favor of defendants Central Pennsylvania Teamsters Health and Welfare Fund and Central Pennsylvania Teamsters Pensions Fund, and their Trustees, and against all plaintiffs except Acme Markets, Inc, on counts VIII and X to the extent those counts seek equitable relief under LMRA.

IT IS SO ORDERED.